Raymond MIRANDA, Petitioner,

v.

UNITED STATES of America, Respondent.

No. 69 Civ. 1575.

United States District Court, S. D. New York.

Jan. 16, 1970.

Raymond Miranda, pro se.

Robert M. Morgenthau, U. S. Atty., for the U. S.; John W. Nields, Jr., Asst. U. S. Atty., of counsel.

WYATT, District Judge.

This is a motion under 28 U.S.C. § 2255 by Raymond Miranda, acting for himself and without counsel, to vacate and set aside the sentence imposed by this Court on September 26, 1968 (on indictment 68 Cr. 207) and under which Miranda is now in custody at the United States Penitentiary in Atlanta, Georgia.

The indictment (68 Cr. 207), returned on March 4, 1968, charged Miranda and Antonio Rivera in one count with receipt etc. of heroin, a narcotic drug (21 U.S.C. §§ 173, 174).

On August 22, 1968 Miranda pleaded guilty. He was represented by appointed counsel, Bernard Moldow, Esq., then of the Legal Aid Society and now a Judge of the New York City Criminal Court.

On September 26, 1968, after hearing appointed counsel and after allocution, sentence was imposed. The sentence was to imprisonment for six years.

By letter dated November 19, 1968, Miranda requested a reduction of sentence. Treating the letter as a motion to reduce sentence, the motion for reduction of sentence was denied by order filed December 2, 1968.

The papers on the present motion were mailed by Miranda on April 1, 1969. An order of Judge Motley permitting Miranda to proceed under 28 U.S.C. § 1915 motion papers themselves were filed on April 17, 1969.

The grounds for the present motion are: (1) that at the time of the guilty plea Miranda was "too incompetent to understand the proceedings, or to properly assist in his own defense"; (2) that at time of sentence Miranda was "too incompetent to stand trial" and "in his mentally limited way protested sentence being imposed"; (3) that the representation by appointed counsel was "incompetent" because at the time of entry of the plea of guilty counsel knew that Miranda was "confined in restraints at Ricker's Island, N. Y. Hospital Psychiatric Ward"; (4) that the rights of Mir-

anda were "abridged" by the United States Attorney because, with "prior knowledge of sufficient evidence for a conclusive suspicion of movant's mental competency" the United States Attorney failed to move for a judicial determination of competency; and (5) that the Court, before accepting the plea of guilty and before imposing sentence, should have made a judicial determination of "mental competency" (citing 18 U.S.C. § 4244) because the Court had before it "irrefutable conclusive evidence of suspicion of movant's mental competency". The relief sought is that Miranda be released from custody.

By papers filed April 29, 1969, Miranda made a second motion. This was for his production in Court and for the appointment of counsel to represent him. A separate order on that second motion is being filed.

By papers filed August 20, 1969, Miranda made a third motion. This was for his examination by an "independent psychiatrist" and for an amendment to his principal motion. The amendment alleges that at the time his guilty plea was entered he was produced in court by a writ of habeas corpus, that the officers executed the writ by bringing Miranda from the Rikers Island Hospital Psychiatric Ward, that they had a duty so to inform the Court, that the probation officer investigated Miranda and if this were properly done then the probation officer concealed the fact that when the guilty plea was entered Miranda was in the psychiatric ward at Rikers Island "under heavy medication and psychiatric treatment for attempted suicide and narcotic addiction". The charge is that material evidence was suppressed by officers of the Court. A separate order on that third motion is being filed. The amendment is allowed and considered on the present motion.

The averments of Miranda to show that he was incompetent at time of guilty plea and sentence are: that at time of guilty plea he was held "in restraints" in the psychiatric ward at Rikers Island "due to attempted suicide and heavy narcotic medication"; that he had also previously attempted suicide; that he had been a drug addict since 1955; that he had been continuously under the influence of narcotics for some 16 months before his arrest on the federal charge; that while confined after his arrest by federal officers he "became incompetent"; that he was "still under heavy narcotic sedation" when he was brought to this Court and pleaded guilty and that at the time of sentence Miranda was "too incompetent to stand trial" and "in his mentally limited way protested sentence being imposed". There is no averment by Miranda that he was given any medication, "narcotic sedation" or otherwise, after August 22, 1968 and before sentence on September 26, 1968.

A motion seeking to vacate and set aside a judgment of conviction and sentence on the grounds of mental incompetence at the time of pleading may properly be made under 28 U.S.C. § 2255. Bishop v. United States, 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956) (per curiam). United States v. Cannon, 310 F.2d 841 (2d Cir. 1962). The Court is required to grant Miranda a prompt hearing on his motion " * * * [u]nless the motion and the files and records of the case conclusively show that * * * [he] * * * is entitled to no relief." 28 U.S.C. § 2255.

The files of this Court in the custody of the Clerk and the notes of the Court reporter are clearly "files and records of the case" as those words are used in 28 U.S.C. § 2255. So also is the presentence report of the probation officer, Streator v. United States, 395 F.2d 661, 662 (5th Cir. 1968) (per curiam).

The United States Attorney at my request submitted process copies of the medical records of Miranda while he was in federal custody after his arrest on the federal charge and also while he was in the custody of correction officers of the City of New York and was at the Hospital on Rikers Island. These seem clearly to be "files and records of the case". Such appears to have been assumed by

our Court of Appeals in United States v. Falu, 421 F.2d 687 (1969) (per curiam).

In *Falu,* Judge Cooper had denied, without a hearing, a motion made under Section 2255 by Falu, a federal prisoner, to vacate and set aside his sentence on the ground that he had been under the influence of narcotics at the time of his guilty plea and at the time of sentencing. In determining that Falu had not been under the influence of narcotics at the time of his guilty plea, Judge Cooper relied on Falu's medical records from Federal Detention Headquarters at West Street, which records were attached (Exhibit C) to an affidavit filed in opposition to the motion by the United States Attorney. These records showed that Falu had not been given any drugs for the treatment of his narcotic addiction within thirty-six hours before his plea of guilty. Judge Cooper referred to the medical records as "files and records of this case". The Court of Appeals affirmed, but without discussing the specific point as to the medical records.

On the basis of the "files and records of the case", as above described, it is conclusively shown that Miranda is entitled to no relief; the motion should be denied, therefore, without a hearing.

The following is the situation disclosed.

Miranda was born in Puerto Rico in 1933 and came to New York in 1949. He has an extensive criminal record, including a conviction for assault and robbery.

In the early hours of February 27, 1968 Miranda and Rivera were arrested by federal officers for violation of the narcotics laws. Undercover agents had arranged with Miranda to buy heroin; Miranda arranged with Rivera to produce heroin and both were then immediately arrested.

Miranda was taken to Federal Detention Headquarters at West Street in Manhattan, where he was admitted to the clinic at 8:25 a. m. on February 27 for observation and treatment for drug addiction. Miranda had been taking hero-

in injections intravenously since 1958, and his "last indulgence" had been on February 26. Miranda was immediately given a ¼ grain dose of morphine sulfate, a narcotic with analgesic and sedative qualities. United States Dispensatory and Physician's Pharmacology [hereafter U. S. Dispensatory] 737–741 (26th ed. 1967).

Later that day Miranda was arraigned for bail before the Commissioner on a complaint sworn to by an agent of the Bureau of Narcotics. Miranda was apparently unable to make the $10,000 bail set by the Commissioner and as a result he was retained in custody at West Street. At 9:00 p. m. that night Miranda was given another dose of morphine sulfate.

On February 28 and February 29 Miranda was given morning and evening doses of morphine sulfate. On March 1, morphine sulfate was administered in the evening in the usual dosage; however, in the morning Miranda was given a 150 mg. dose of Thorazine, an antispasmodic drug. U. S. Dispensatory 295–296. On March 2 Miranda was given the same dose of Thorazine in the morning, and in the evening he received a 1 gr. dose of a drug apparently called "Donolar" or "Dondar", not otherwise identified. On March 3, Miranda was again given Thorazine in the morning; in the evening he was given Doriden, a non-barbiturate sedative, and Phenergan, an antihistamine. U. S. Dispensatory 542, 959–960.

At about 6:00 on the morning of March 4 Miranda was discovered apparently attempting to hang himself with a sheet. The records state that "no serious damage" was noticed. First aid was applied. Miranda states in his papers that oxygen had to be administered to revive him; the West Street records make no mention of this. The clinical record shows that Miranda was ordered released that day to the general prison population from the "denarcotization unit". He was given a physical examination and a notation was made that he might be given sedation for three nights.

■ The medical records at West Street end at Miranda's release to the general prison population on March 4, 1968. This means that after that date he required no medical attention of any kind at West Street. There is nothing in the records to indicate any past mental disturbance nor any mental condition at West Street, other than the attempt at hanging himself. Such attempt does not itself establish incompetency. See Bradley v. United States, 347 F.2d 121, 123 (8th Cir. 1965) (per curiam), cert. denied 382 U.S. 1016, 86 S.Ct. 628, 15 L.Ed. 2d 530 (1966). The attempt is much more consistent with the "withdrawal sickness" of a drug addict which—aside from purely physical effects—produces "nervousness" and "anxiety". United States Department of Health, Education, and Welfare, Narcotic Drug Addiction (Mental Health Monograph No. 2) page 3. See also Council on Pharmacy and Chemistry, *Report to the Council,* 149 J.A.M.A. 1220, 1221 (1952). No one at West Street drew any conclusion (or suspicion) of mental disorder from the hanging attempt.

As already noted, the indictment of Miranda and Rivera was returned on March 4, 1968.

On March 6, 1968, Miranda appeared before Judge Weinfeld. Mr. Moldow was then appointed as counsel to Miranda. Pleading was adjourned until March 7, and Miranda was remanded to custody in default of $10,000 bail.

Apparently there was a further adjournment of pleading to March 21.

On March 21, 1968, Miranda again appeared before Judge Weinfeld. Pleading was adjourned until April 4, and Miranda was released from custody on his own recognizance, the government not opposing.

On the same day as his release from federal custody, Miranda was arrested by city or state officers for burglary in the third degree.

Apparently Miranda was able to secure his release from city or state custody because on April 4, 1968, he pleaded not guilty before Judge Pollack in this Court and was continued on his own recognizance, without any objection by the government.

On August 12, 1968 Miranda was arrested, under the name of "Joseph Ramos", in Bronx County by city police officers on narcotics charges. He was first put in the Bronx House of Detention (sometimes called a "city prison" and sometimes referred to in records as "c.p.Bx."). On the same day, August 12, he was transferred to the hospital at Rikers Island and placed in an "infirmary" ward on the fourth floor. The reason for his hospital admission was apparently drug addiction and for withdrawal treatment.

Miranda apparently had been stabbed in the chest on August 5 and had spent two days at Roosevelt Hospital before he "signed himself out". He complained on August 12 of severe chest pains; there is a notation "healed" as to the stab wounds. Apparently Miranda said that his drug addiction began in 1955, that for the last two years he had been using five "bags" of heroin and six to eight "goof balls" daily, and that he had had an injection that morning. A five day course of medication was prescribed for Miranda involving the twice daily administration of diminishing doses of Methadone, "a dependence-inducing, morphine-like narcotic analgesic" used in the treatment of drug addiction (see Note: Methadone Maintenance for Heroin Addicts, 78 Yale L.J. 1175, 1185 n. 36 (1969)) and Nembutal, a sedative. U. S. Dispensatory 1065–1066. Additionally, Tedral, a drug for the treatment of bronchial asthma, and Tetracycline, a broad spectrum antibiotic drug, were prescribed. Physicians Desk Reference to Pharmaceutical Specialties and Biologicals (22d ed. 1967) (hereafter Physicians Reference) 1206. U. S. Dispensatory 1141–1170. Darvon, an analgesic similar to Methadone, was also prescribed, but the notation as to frequency is not decipherable. U. S. Dispensatory 963–964. At the same time, a chest x-

ray was ordered. ("Orders" for August 12).

It appears from the "Nurse's Notes" for August 12 that doses of Methadone and Nembutal were administered as prescribed on that day. Miranda had a quiet night.

On August 13, the previously ordered x-ray was taken, and no damage appears to have been found. On the "Orders" sheet there is an entry which directs the termination of all Methadone, Tetracycline and Darvon; twice daily doses of Librium, a sedative (U. S. Dispensatory 276–277), were prescribed for a two day period. Two doses of Librium were administered on August 13, as was a single dose of Tedral. ("Medication Record"). Miranda had a "fair" day and a quiet night followed.

On August 14, Librium and Tedral were administered as on the day before. Miranda spent a quiet day, a "fair" evening and a "routine" night.

There is an entry in the "Progress Notes" for August 15 that Miranda was complaining of a chest pain. The examining physician noted: " * * * pulse is normal, of [sic] tense and rhythmical. BP = 116/70. Pat. Drug Addict—relaxed. See med. order." The "Orders" sheet indicates the administration of a "2 gr." dose of sodium phenobarbital, a barbiturate which is a mild sedative. U. S. Dispensatory 885–887. There is a statement in the "Progress Notes" for August 15: "marked exaggeration of symptoms", which seems reasonably to mean that Miranda was suffering severely from the same drug "withdrawal sickness" experienced on an earlier occasion, as noted. Otherwise, the day and evening were "routine". ("Nurse's Notes"). A dose of Tedral was administered as prescribed. ("Medication Notes").

At about 12:40 a. m. on August 16, Miranda was discovered trying to hang himself from his bed frame by a sheet. A guard removed the sheet from Miranda's neck and summoned the physician on duty. The doctor's report indicates that when he arrived, Miranda was being held down on a mattress by three orderlies and having very strong convulsions. Miranda's pulse was frequent, and his bloodpressure could not be taken. Miranda, however, was not injured. ("Progress Notes").

This suicide attempt seems exactly like that at West Street, namely, caused by "withdrawal sickness". Indeed, the physician who attended Miranda minutes after his attempted suicide on August 16 noted at that time that he was suffering from "acute drug withdrawal syndroms" ("Orders" for August 16; so in the original). The "Orders" sheet indicates the administration of a dose of amytal sodium, a barbiturate used in narcotherapy (U. S. Dispensatory 65–66), and directions for "restraining" Miranda until 6:00 a. m (by handcuffs) and for his transfer to the third floor under observation. The meaning of a transfer to the third floor from the fourth floor does not appear from the records; it may well be, as Miranda suggests, that the third floor was for psychiatric treatment.

The "Nurse's Notes" for August 16 indicate that Miranda was transferred for observation to the third floor in handcuffs at about 2:00 a. m. on that date. Miranda was given Amphogel, an antacid, for heartburn, at about 7:00 a. m. Physicians Reference 1227. The handcuffs were removed at about the same time. Miranda had not slept, but he was quiet and coherent. (See also "Progress Notes" and "Orders" sheet for August 16).

Miranda was examined later in the day, and a small laceration on Miranda's chest was noted and dressed. A 400 mg. dose of Equanil, a sedative, was administered. U. S. Dispensatory 689–690. The handcuffs were put on for the night and removed at 7:00 a. m. on August 17. ("Orders" for August 16; "Nurse's Notes" for August 17).

Miranda seems to have spent quiet days and nights August 17 and August 18. There is no record of any restraints

being used, of any medication being given, or of any visits by a doctor.

The physician who saw Miranda just after his August suicide attempt had advised a psychiatric evaluation. A psychiatric examination was made on August 19 by a Dr. Frantz, who signs himself "Qualified Psychiatrist". Dr. Frantz recorded, among other things, that Miranda had never been in a mental hospital and that he was going to Court on August 22. The notes of Dr. Frantz end with the statement: "Probably can be discharged to Medical for care of chest pain." ("Progress Notes" for August 19). The medical records also contain a memorandum from Dr. Frantz to the Medical Clinic of the Hospital, dated August 21, which states that Miranda: " * * * at this time has been found to be not psychotic. He is being referred to you for medical care and treatment."

It thus appears that a qualified psychiatrist, knowing that Miranda was facing criminal charges and that he had attempted suicide on August 16 and that he was going to Court on August 22, found on August 19 that he was "not psychotic", that is not mentally incompetent.

The notes of the nurses show that from August 19 to August 22 there were no complaints by Miranda and no medication; there was simply "routine care".

On August 22, 1968 Miranda appeared with Mr. Moldow as his counsel before Judge MacMahon. Mr. Moldow asked to change Miranda's plea to a guilty one. The transcript shows that Miranda answered questions understandingly. He stated: "I plead guilty". He admitted that he had heroin in his possession. After questioning, the Court accepted the plea of guilty. Mr. Moldow referred to narcotics charges in the state court and stated that Miranda would appreciate "being sentenced as quickly as possible". The Assistant United States Attorney urged that a presentence report be obtained and this the Court ordered. There was nothing to suggest to anybody even a suspicion that Miranda was not mentally competent.

After August 22, the only notations in the medical records are of "quiet" nights and "fair" or "routine" days.

On August 27 the physicians ordered that Miranda be discharged from the hospital and on August 28 he was transferred to the Bronx House of Detention.

Meanwhile, the case of the co-defendant, Rivera, had been assigned to me for trial. There was waiver of a jury. The trial was on August 23; Rivera was found guilty.

Miranda with Mr. Moldow as counsel appeared before me for sentence on September 26, 1968. The sentence was referred to me because the trial of Rivera had been before me. Miranda appeared to be perfectly competent. While he declined to say anything on his own behalf, Mr. Moldow asked for the minimum sentence, giving reasons. Because of the past record of convictions, including crimes of violence, the minimum sentence did not seem appropriate and seven years was first announced but with a desire that such sentence run concurrently with any sentence to be imposed in the state court. Mr. Moldow pointed out technical difficulties with state and federal sentences and asked for a reduction to six years and simply let Miranda "take his chances with the state authorities". This suggestion was adopted and a six year sentence imposed. Miranda himself made a statement to the Court about his situation in the state court and how he wanted to return to Puerto Rico "as soon as this is over".

The presentence report shows that Miranda spoke understandingly to the probation officer, who concluded that he was "relevant, coherent, and direct, showing a remarkable memory for dates and events in his life". Reference was made to prison psychiatric reports in 1962 and 1964, showing Miranda to be "without psychosis".

The record shows, therefore, that at the time of the plea of guilty and at sentence Miranda was perfectly competent. The present claim that he "protested sentence being imposed" is shown to be false by the stenographic transcript.

By order filed July 17, 1969, this Court directed that Miranda be given a psychiatric examination through the United States Bureau of Prisons and that a " * * * complete psychiatric report on Miranda's behavior, psychiatric treatment and general competence now and at the time of his plea of guilty * * *" be furnished the Court, along with all relevant hospital records.

The psychiatric examination ordered by the Court was given Miranda on August 8, 1969, by Dr. Joseph F. Alderete, Chief Medical Officer and Psychiatrist of the United States Penitentiary in Atlanta, Georgia. A report has been submitted which is based on that examination, a number of examinations made by Dr. J. A. Mascourt, a consultant in psychiatry, and the records from West Street, Rikers Island, and the Atlanta Penitentiary. The conclusion is that Miranda, while of "low intelligence", is now competent and that he was "most probably competent" when he pleaded guilty on August 22, 1968, in this Court. (The form of the opinion as to competency on August 22, 1968 appears due to the fact that the date is a year before the examination.)

Because the psychiatric examination of August 8, 1969 was made after the plea of guilty and after the sentence, there may be doubt that the report of that examination is part of the "files and records of the case", as those words are used in 28 U.S.C. § 2255. In consequence, this report has been disregarded for purposes of the present decision.

The "files and records of the case", however, show conclusively that Miranda is entitled to no relief. The motion must be denied, without a hearing, therefore, unless every claim of mental incompetency entitles the claimant to a hearing. Such seems to be the rule in the Tenth Circuit. Butler v. United States, 361 F.2d 869 (10th Cir. 1966). But the contrary rule obtains in the Sixth Circuit. Splitt v. United States, 364 F.2d 594 (6th Cir. 1966), cert. denied 385 U.S. 1019, 87 S.Ct. 746, 17 L.Ed. 2d 555 (1967). It seems to me that

United States v. Falu, already cited, establishes that in this Circuit the "files and records of the case" may show "conclusively" that a claim of mental incompetency is without merit and a motion by claimant under 28 U.S.C. § 2255 may be denied in such a case without a hearing.

The motion of Miranda under 28 U.S. C. § 2255 is accordingly in all respects denied.

So ordered.