**Raymond MIRANDA, Petitioner,**

v.

**UNITED STATES of America,
Respondent.**

**No. 69 Civ. 1575.**

United States District Court,
S. D. New York.

Aug. 27, 1971.

Judson A. Parsons, Jr., New York City, for petitioner; Frank M. Headley, Jr., New York City, of counsel.

Whitney North Seymour, Jr., U. S. Atty., for respondent; Bobby C. Lawyer, Asst. U. S. Atty., of counsel.

WYATT, District Judge.

This is the decision, after a hearing, of a motion by Miranda to vacate and set aside a sentence imposed on him on September 26, 1968. 28 U.S.C. § 2255. The sentence was imposed after a plea of guilty to a one count indictment charging movant and Antonio Rivera with the receipt, concealment, etc. of some 64 grams of heroin. The sentence was imprisonment for 6 years.

The ground for this motion is that Miranda was mentally incompetent at the time of plea and sentence and was under "heavy narcotic medication".

Miranda is proceeding in forma pauperis. 28 U.S.C. § 1915(a).

A hearing was required because the earlier denial of the motion without a hearing (325 F.Supp. 217) was reversed by the Court of Appeals on February 5, 1971 (Lumbard, Moore and Smith, C. JJ.). 437 F.2d 1255

The motion is again denied. The claims made are false and the movant, under oath, wholly unworthy of belief.

Miranda is a parasite with a long and vicious criminal record. In this proceeding he has wasted the time and energy of many persons and has caused public funds in a substantial amount to be squandered. This depressing example suggests that the procedure permitting free and easy collateral attack on crimi-

nal convictions is in urgent need of reform. One possibility is an amendment to the statute (28 U.S.C. § 2255) in respect of the necessity for hearings on such motions as this. Another possibility is to require a movant such as Miranda to supplement "his constitutional plea with a colorable claim of innocence". Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U.Chi.L.Rev. 142 (1970). It may be noted that Miranda has never claimed to be innocent of the offense to which he pleaded guilty. Indeed, he could not do so because he and Rivera were arrested while in the act of making a sale of the heroin in hand to an undercover agent. Miranda admitted his guilt at the time of his plea and later to the probation officer; in his testimony at the hearing he again specifically admitted his guilt, confessing that he had asked Rivera for "heroin" (SM 47) which in fact was procured by Rivera for the sale; Miranda more than once recognized that he was in fact guilty (SM 48, 243). Rivera was tried by me without a jury and was convicted; the evidence fully established the guilt of Miranda as well.

After the earlier denial of the present motion, Miranda filed a notice of appeal which was submitted to me for decision, whether to certify that the appeal was not taken in good faith. 28 U.S.C. § 1915(a); F.R.A.P. 24(a). This presented a close question. On the one hand, the records in my view showed conclusively that Miranda was entitled to no relief and that no more time, effort and money should be wasted in further considering his frivolous claims. On the other hand, it had become the rule in the Tenth Circuit that a hearing is required whenever there is a claim of mental incompetency at time of plea or sentence. Butler v. United States, 361 F.2d 869 (10th Cir. 1966). I decided not to obstruct the appeal by making the certificate; it was my hope, not realized in the event, that our Court of Appeals would adopt a rule for this Circuit that no hearing need be held where the records

clearly refute the claim of incompetence made by movant.

While the reversing opinion of the Court of Appeals recognizes that the broad claim for movant was mental incompetence, the specific fact issue directed to be determined was whether Miranda was under the influence of narcotics when he pleaded guilty. The opinion states (437 F.2d at 1259):

> "* * * we are not convinced that it is possible to negate the claim of heavy sedation at the time of plea on the record available to the court on the motion."

The opinion indicates that the Court of Appeals accepted the claim of Miranda as to his suicide attempts: "He had twice attempted suicide while in withdrawal" (437 F.2d at 1258). As later shown herein, the so-called suicide attempts were not real but faked. Moreover, the further evidence confirms the conclusion from the records that neither at time of plea nor at sentence was Miranda under any "narcotic sedation", heavy or otherwise.

After the reversal by the Court of Appeals, arrangements were made for the required hearing. Counsel who had represented Miranda by appointment in the Court of Appeals kindly consented to represent him in this Court.

By order filed March 29, 1971, and on application of counsel for movant, preparation of a stenographic transcript at government expense was authorized. 28 U.S.C. § 753(f).

By order filed April 14, 1971, counsel for Miranda was authorized (under 18 U.S.C. § 3006A) to obtain the services of Dr. Stanley L. Portnow of Bellevue Hospital for a psychiatric examination of Miranda.

Hearings were held on March 24, April 16, 22 and 23 and May 5, 14 and 18, 1971.

Miranda himself testified at length and also called to testify three of his sisters, Dr. Portnow (a psychiatrist), and Dr. Frantz (a psychiatrist who was employed in August 1968 at the New York

City Correctional Institution for Men on Rikers Island ("Rikers", for convenience)).

The government called Dr. Sherman (a physician at Rikers in August 1968), Ricks (a deputy United States Marshal for the Eastern District of New York), Pallatroni (a special agent of the Bureau of Narcotics and Dangerous Drugs), Demos (the probation officer who prepared the presentence report on Miranda), Judge Moldow (who as a lawyer represented Miranda at plea and sentence), and Leisure (who as an Assistant United States Attorney prosecuted Miranda).

The Court called as witnesses Caldwood, Edwards, and Walls (correction officers at Rikers in August 1968); and Reed, Mills, and Richardson (nurses at Rikers in 1968).

Extensive medical records and other documents were received in evidence.

The findings which follow are based on the testimony and on the documentary evidence. Wherever the testimony of Miranda differs in any respect from other evidence, I have rejected the testimony of Miranda as a fabrication designed simply to manipulate the judicial process to secure his liberty so as to be able to resume his career in crime. The rejection of Miranda's testimony is based, among other things, on observation of him and his demeanor while testifying.

All the evidence from state institutions for the period prior to 1968 shows Miranda to have been competent. A psychiatric report of January 5, 1962 from Green Haven Prison states that he was "most cooperative—was in excellent contact * * * there was no evidence of a psychotic nature. He was in good contact, spontaneous, and showed no outstanding difficulties" (Ex. 4). It was noted that he used drugs. A psychiatric report of December 23, 1964 from Sing Sing Prison states (Ex. 4):

"No history of injuries or diseases that may have led up to brain damage. Nevertheless his abortive pugilistic career must be considered as having been specifically hazardous in this respect * * *. Without mental disorder. Psychopathic personality, antisocial. Aggressive features. Drug user. Average intelligence."

Miranda and Rivera were arrested in the early hours of Tuesday, February 27, 1968, by federal narcotics officers (including agent Pallatroni) after they had arranged a sale for $700 of about 64 grams of heroin to undercover agents. They were caught red-handed and the heroin itself was seized; Miranda had solicited Rivera to produce and sell the heroin.

At 8:25 in the morning of February 27, Miranda was admitted to Federal Detention Headquarters in West Street, classified as a drug addict, and given treatment (¼ grain of morphine sulphate) either to help him during the withdrawal period or to treat his addiction. According to the medical records, Miranda stated that he had last taken heroin on Monday, February 26.

The opinion of the Court of Appeals states that while in federal custody Miranda suffered "severe narcotic withdrawal" (437 F.2d at 1256). Doubtless every addict, when deprived of his drug, suffers from withdrawal sickness but I am unable to find any evidence that the withdrawal of Miranda on and after February 27 was "severe". It is said that withdrawal is "much less severe" where, as in the case of Miranda, he is "withdrawn or detoxified * * * under the medical method commonly used today" (Public Health Service, Narcotic Drug Addiction, Mental Health Monograph 2, pp. 3–4).

At 12:45 in the afternoon of February 27, Miranda was brought before the Commissioner. Agent Pallatroni had sworn to a complaint charging a violation of 21 U.S.C. §§ 173, 174. Bail was fixed at $10,000 and, no bail being posted, Miranda was remanded.

For the fifteen years before this arrest, Miranda had been many times in and out of New York prisons. Among

other things, he had broken into a tavern to steal money; he had pushed, kicked and beaten a man to death, for which he was charged with homicide, later reduced to assault in the second degree; he had held up a radio shop for which he was convicted of assault and robbery; he had been convicted of possession of heroin. In light of this record, the bail fixed was by no means excessive.

There is no history of any mental illness of Miranda. He was never in a mental institution. In fact, his present motion avers that he "became incompetent" after he was confined in West Street on February 27, 1968.

At West Street, Miranda was given a quarter grain of morphine sulphate in the evening of February 27, the same dose was given in the morning and evening of February 28 and 29 and in the evening of March 1. The medical records from West Street show conclusively that after the evening dose on March 1, no other narcotic drugs were given to Miranda. There is no notation that he was in pain or having any difficulty whatever.

There are records that at 6 a. m. on Monday, March 4, Miranda "tried to hang himself" by using a bedsheet. It was not necessary to call a doctor; an ambulance attendant and others saw him but found "no serious damage". He required no treatment nor medication. Specifically, there is nothing to support a suggestion that oxygen was administered to revive him. No one noted any indication that his mind was affected.

On the same day, March 4, Miranda was released from the "denarcotization unit" and placed with the general prison population.

No evidence was produced as to the hanging incident at West Street except for the records themselves. Miranda himself claimed to have no recollection of the incident (SM 23) and gave no evidence about it.

I can only conclude that whatever Miranda did on this occasion was not with a design to take his life, but to call attention to himself, undoubtedly in the hope that the morphine sulphate doses, stopped on March 1, would be resumed. Medical experts, experienced with addict prisoners, testified that they often make fake attempts to injure themselves "so they can be given more potent medication" (SM 182, see also SM 149). The incident at West Street was a faked suicide attempt and in any event is no evidence of any mental defect of Miranda.

The grand jury returned a one count indictment against Miranda and Rivera on March 4, 1968. This charged that they received, etc., 64 grams of heroin (21 U.S.C. §§ 173, 174).

On March 6, Miranda was in open court before Judge Weinfeld who assigned Bernard Moldow, Esq., of the Legal Aid Society to represent Miranda. Judge Moldow is now a judge of the New York City Criminal Court but at that time he had been defending criminal cases for the Legal Aid Society for over 20 years and had defended upwards of 20,000 cases (of which from a quarter to a third involved narcotics offenses). He was well known as an able and experienced advocate, one quickly able to detect signs of mental incompetence, of drug use, or of drug influence.

Mr. Moldow on that day interviewed Miranda, who admitted the offense and gave the details. Miranda said he arranged for the sale of heroin, got the heroin from Rivera, and got into a car to deliver it when he was arrested; Rivera was waiting for the money when he was arrested by other agents. Mr. Moldow testified (SM 15) that he had no trouble in communicating with Miranda or getting responses from him. Moldow advised him what the mandatory penalty was and made a note to consider in the future whether cooperation by Miranda would enable him to have a "tax count" substituted.

Pleading by Miranda was then adjourned from time to time while cooperation by Miranda was discussed. Miranda did agree to cooperate and talked

to agent Pallatroni about supplying information as to persons engaged in the narcotics traffic. The government was thus persuaded to consent to a release of Miranda on his own recognizance. This was done by Judge Weinfeld on March 21.

Thereafter, on April 4, Miranda pleaded not guilty.

The cooperation of Miranda did not satisfy the government. His information was "very vague" (SM 297) and not sufficient to enable the government to proceed against anybody. Accordingly, the government dropped any idea of substituting a "tax count" and put the case on the calendar for trial.

On May 23, Miranda failed to appear in Court when required and a bench warrant was issued. Miranda was then a fugitive and had reverted to the use of heroin.

On August 2, he was admitted to Roosevelt Hospital for treatment of a superficial stab wound. He was discharged on August 5 as "improved". It was noted that he was an addict and some methadone was given. There is no indication in the full hospital records of any mental defect.

On August 12 under the name of "Joseph Ramos", which he was then using, Miranda was arrested in the Bronx by New York police. He was in possession of heroin and drug apparatus. He was charged with drug offenses and in New York City Criminal Court he was committed to custody in default of $1500 bail. At the Court and later at the Bronx House of Detention for Men (BHDM), "Ramos" requested medical attention, not for drug addiction or withdrawal sickness, but for chest pain believed to be from his stab wound. This appears from the note made at the time by the doctor at BHDM; "Ramos" *denied* that the chest pain was "due to withdrawal ss" [probably "symptoms" or "sickness"]. The doctor also noted that "Ramos" last took heroin on August 11. The doctor sent Miranda to the Infirmary of the Department of Correction on Rikers Island. As long as he was in the Infirmary he was known as "Ramos" but for simplicity he will here be referred to only as Miranda.

Miranda was admitted to the Infirmary on August 12 and assigned to ward 4B on the fourth floor. This is an open ward, without cells, which usually had 35 to 45 individual beds, each resting on the floor, with the bed frame about 48 inches from the floor. At night the lights in the ward are dimmed (for sleeping) but it is not dark and a nurse and a correction officer are on duty. Thus, at any hour of the day or night the actions of any patient can be observed by the other patients, the nurse and the officer. Near the ward are separate washrooms with showers, toilets, etc. The showers are stall showers with surrounding walls. The washrooms have high windows and window frames. The patients naturally have free access to the washrooms.

The notes of the admitting doctor on August 12 indicate that Miranda did not complain of withdrawal sickness but of continuous chest pain, attributed to the stab wound, and of hard breathing due to asthma. Physical examination at that time so indicated and also that he had heroin withdrawal symptoms first degree, that is "the mild" stage (SM 175, Ex. 2).

The admitting doctor ordered that Miranda be given 10 milligrams of methadone twice a day for two days and 5 milligrams twice a day for three days (this was for heroin withdrawal), Nembutal for the same period (a barbiturate for barbiturate withdrawal), Tedral (for asthma), tetracycline (for the stab wound) and Darvon (a pain reliever like aspirin).

On the following day, August 13, Miranda was seen by Dr. Sherman, the doctor in charge of the fourth floor. Dr. Sherman testified; he was an impressive witness and his testimony is accepted without any question.

On August 13, Dr. Sherman found that the "first degree withdrawal symp-

toms had cleared up", that Miranda "was perfectly all right as far as withdrawal was concerned", that "he showed no signs of withdrawal" (SM 187). Accordingly, Dr. Sherman eliminated methadone and also the tetracycline and Darvon; he added Librium for two days "for the anxiety picture that he presented" (SM 187). Librium is a sedative.

The nurse's notes show that on August 13 and 14 Miranda was "fair" or "quiet" and appeared comfortable.

Early in the morning of August 15, Miranda complained to the doctor on duty (not Dr. Sherman) of chest pain but the doctor could find nothing wrong. He noted that Miranda was a drug addict but that he was "relaxed". He gave Miranda a mild sedative, by injection because Miranda refused it by mouth.

On August 15, Miranda insisted on use of a wheelchair. Dr. Sherman would not permit him to use a wheelchair because there was no need for it. Dr. Sherman noted that on this day there was a "marked exaggeration of symptoms" by Miranda, meaning that there "was no physical reason for his complaints" (SM 178), that he was malingering. In my earlier opinion it was stated that Dr. Sherman's note seemed "reasonably to mean that Miranda was suffering from * * * drug 'withdrawal sickness' * * *" (325 F.Supp. at 221). The testimony of Dr. Sherman, who himself made the note, shows that this was an error, that no withdrawal sickness was involved, but that Dr. Sherman had found Miranda to have been faking.

The observations by the nurses on August 15 show the condition of Miranda up to midnight to have been "routine".

### The Rikers Island "Attempted Suicide"

At about 12:40 a. m. on August 16 occurred a so-called "attempted suicide" which appears to have been considered significant by the Court of Appeals (437 F.2d at 1258). At that time Miranda was found by Reed (a nurse) and Walls (a correction officer) with a sheet around his neck apparently trying to hang himself from the bed frame. Walls removed the sheet and called Captain Caldwood and Dr. Laudonski.

Dr. Laudonski did not testify.

Reed, Walls, and Caldwood testified but could not remember the incident nor Miranda (SM 355, 359, 389, 489–490).

Dr. Laudonski made a record at the time reading as follows (Ex. 2; abbreviations used in the record have been changed into the words for which they stood):

"August 16, 1968 at 12:44 a. m. This patient tried to hang himself on his bed frame a few minutes ago but I was not a witness and I found this patient on the mattress in very strong convulsive status holding by three orderlies. Pulse frequent. Blood pressure unable to be taken. [word illegible] No evidence of injury. X-ray not necessary. Incident reported. Patient transferred to third floor. See medical order."

The medical order of Dr. Laudonski reads as follows (Ex. 2):

"See progress notes. Acute drug withdrawal syndrome. (1) 3 and ¾ grams amytal sodium im (2) restraining until 6 a. m. (3) transferred to third floor under observation."

Reed, the nurse, made the following record at the time (Ex. 2):

"About 12:40 a. m. patient was found apparently trying to hang himself from the bed. The officer and I found him with a sheet around his neck and choking. The officer took the sheet and I called the doctor and the captain. They responded at 1:10 a. m. Patient was given 3 and ¾ of sodium amytal im [by injection] and transferred to the third floor for medical observation. Orders of Dr. Laudonski."

There is no evidence that Miranda was suffering in any way from withdrawal sickness, nor that he was suffer-

ing from anything else which would give the slightest motive for suicide.

There was no injury whatever from the "attempt".

As Dr. Sherman explained, it was "a physical impossibility" (SM 210) for Miranda to kill himself by hanging from the bed frame with a sheet, this because the bed was no more than four feet from the floor, much less than the height of Miranda or any other prisoner; no one could make any "serious attempt" in such a fashion (SM 179). Dr. Sherman was pressed on cross-examination that Miranda could have choked himself by tying his neck to one end of the bed frame and his feet to the other end. Dr. Sherman described this as "making a hammock out of himself" and admitted that this might choke him *provided* "somebody came and sat on his belly button" (SM 211).

No serious attempt at suicide could be made by hanging from the bed because this is in full view of 30 to 40 other patients, the officer and the nurse; some one of them would be bound to stop the attempt, just as in fact happened and precisely as Miranda expected would happen.

Dr. Sherman and Captain Caldwood both explained that if a patient were really trying to kill himself by hanging, there were places available in the washrooms much more effective than the frame of a four feet high bed—for example, high window frames, windows, shower walls, shower fixtures, and the like (SM 181–182, 359–360).

The evidence satisfies me that Miranda did not make any attempt at suicide at Rikers Island but, as at West Street, faked such an attempt, undoubtedly in the hope of getting doses of drugs.

### Miranda on the Third Floor, August 16–20

Miranda was transferred to the third floor where he could be kept under better observation.

The third floor is for patients who present psychiatric or security problems.

When there is no further problem of this sort with a patient, he should be sent back to one of the other floors, but there are delays in completing checks of a patient before sending him back. Thus, that a patient may remain on the third floor does not of itself mean that he continues to present a psychiatric problem (SM 208).

There are individual cells on the third floor, one patient to a cell. The cells have three solid walls; the front has iron bars and a door with bars. From the front, all of the cell can be seen and officers, nurses, and the like can check each cell by walking along from one to the other, looking in the front. The cell is about six feet wide and eight feet long. There is a bed, the head of which is placed at the front near the door. There is a wash basin and water closet in the back of the cell, and nearer the front a bench and a table. The patients were locked in the cells at night but during the day they appear generally to have been allowed to leave the cells.

Miranda was received on the third floor in handcuffs at about 2 a. m. on August 16. He was seen at 6:45 a. m. by Dr. Laudonski, who found him quiet and speaking "normally"; his only complaint was heartburn. The doctor ordered the handcuffs removed, prescribed amphojel for the heartburn, and directed that a psychiatric evaluation be obtained.

The records next show that about 7:45 on August 16 (whether morning or evening is uncertain) Miranda asked for medical attention and complained that he had hurt his chest by falling off the bed. At that time, a doctor directed that the place be washed, that a dressing be applied, and that he be given some Equanil, which is a very mild tranquilizer, not directed toward withdrawal sickness.

The prescription of Equanil at 7:45 on Friday, August 16, is the last medication ordered for Miranda at Rikers Island. The records conclusively show this. There are two pages of original

entries by the doctors of their orders for medicine and otherwise. They are on a departmental form for such "orders" and in the handwriting of the doctors.

The order for the Equanil is in the handwriting of the doctor and dated "8/16". Reference to another hospital record shows that it was 7:45 on August 16. The next entry on this same page of the "orders" form is "8/27/68 discharged".

Thus no medication was ordered by any doctor to be given to Miranda after 7:45 on Friday, August 16, 1968, and of course no medication can be given in a hospital except on orders of a doctor. This is self-evident but Dr. Sherman specifically testified that such was the rule at Rikers Island (SM 192–193).

The records do show conclusively that Miranda was not given any drugs or other medication after August 16 and thus, regardless of his mental competency, could not possibly have been under "heavy narcotic sedation" when he pleaded guilty on August 22, as he contended in the Court of Appeals (437 F. 2d at 1258).

Miranda himself did not testify to the giving of any medication to him at Rikers Island (SM 41–42); he testified that he had no recollection of any attempted suicide there and learned of the incident for the first time on August 28, 1968 (SM 42).

The fake suicide attempt caused no harm whatever to Miranda but, apparently not realizing that he was a malingerer and as a precaution, he was at some time in the night of August 16–17 put in handcuffs again. These had been removed by 7 a. m. on August 17 and he was reported as feeling "better".

From this time until his discharge from the Infirmary, it is conclusively shown by the records that he was given no medication whatever and was suffering from no mental defect nor from any physical ailment, either withdrawal sickness or otherwise.

The nurse's notes are as follows:

| August 17 | "fair day, sitting in group" |
| August 17 | "quiet evening" |
| August 18 | "no complaint offered" |
| August 18 | "offered no complaint this p. m." |
| August 19 | "no problems during night" |
| August 19 | "routine care" |

It will be remembered that after the fake suicide attempt a psychiatric evaluation was ordered. This was made by Dr. Frantz on August 19, after an interview with Miranda. Among other things, Dr. Frantz noted specifically that Miranda was going to Court on August 22 and that he had never been in a mental hospital. Dr. Frantz found that he was "not psychotic"—that is, not suffering from a mental disorder, a psychosis—and could be discharged from the psychiatric section (third floor) to the medical section (fourth floor) for care of his chest pain. The written report of Dr. Frantz was dated August 21. As will appear, Miranda was discharged from the Infirmary on August 27 and was not actually transferred from the third floor before then but this was due to administrative lag and not to any belief by anyone that Miranda had a mental defect.

Dr. Frantz was 75 years old when he testified, a psychiatrist with a distinguished career behind him and many years of experience. He made a strong impression of professional skill and of complete candor. His conclusions and opinions are accepted.

On August 20, the nurse noted that Miranda had been delivered to a United States Marshal.

#### The Plea of Guilty

The identity of "Ramos" as Miranda and his confinement at Rikers Island became known to the federal authorities in this District and to Moldow. The latter arranged to confer with his client.

United States Marshals picked up Miranda under a writ of habeas corpus at 10:10 a. m. on Tuesday, August 20, and delivered him to the Marshal's office in

this Court House at 10:50 a. m. on the same day. They returned him to Rikers Island at 3:05 p. m. on the same day, August 20.

The case of Miranda and his co-defendant Rivera was called in the criminal calendar part on that day, Judge MacMahon presiding. The government was pressing for trial. Rivera was not in Court and his counsel asked for an adjournment. Apparently Miranda was in Court; Moldow asked for an adjournment. The case was then put over until Thursday, August 22.

While he was in the Court House, Miranda conferred with Moldow, who had "no problem communicating with him" (SM 20). Miranda told why his "cooperation" had failed, how he had been arrested, the state charges against him, and "all the details" (SM 21). Moldow told him that no "tax count" was possible. Miranda said he wanted to plead guilty.

It cannot be determined whether, when Miranda was returned to Rikers Island on August 20, he was kept in the Infirmary or in some other part of the institution. The Marshals pick up from and deliver prisoners to a central "receiving area" at Rikers Island (SM 230) and cannot know where the prisoner is kept before they pick him up or after they deliver him.

There are no Infirmary records on Miranda for August 21 and 22. This may indicate that on those days he was not kept in the Infirmary but was kept in the "receiving area". Dr. Sherman thought this "likely" (SM 205). It was known, at the time he was returned to the "receiving area" on August 20, that he would be going back to this Court House on August 22. The writ actually delivered to the Warden at Rikers Island was produced from the records there. It required Miranda's production on August 20 and is endorsed: "8/20/68 to Court S.D.N.Y. case adj. to 8/22/68".

The records do not seem to me to be "sketchy at best" (437 F.2d at 1258) but to be remarkably complete. The absence of any Infirmary records for August 21

and August 22 is probably because Miranda was not there on those days but was being held in the "receiving area" to be picked up on August 22.

It is established, however, that, wherever he was on August 21 and August 22, he was not given any medication, narcotics or otherwise. This is because the records conclusively show that no medication of any sort was prescribed for him by any doctor after August 16.

United States Marshals picked up Miranda from the "receiving area" at Rikers Island at 10:15 a. m. on August 22 and delivered him at 11:00 a. m. to the Marshal's office in this building; he was returned to Rikers Island at 2:45 p. m. on the same day, August 22. While he was in this building, Miranda conferred with Moldow and pleaded guilty before Judge MacMahon in Room 318.

The transcript of the taking of the guilty plea shows nothing whatever to indicate that Miranda was drugged or mentally incompetent. The transcript shows an understanding plea of guilty.

At some time on August 22, the case against Rivera had been assigned to me for trial and the time of trial had been fixed for the following day, Friday, August 23.

This must have been known to Miranda when he pleaded guilty because Moldow asked Judge MacMahon to sentence Miranda promptly, that is, without a presentence report. Moldow testified that Miranda "was very interested in immediate sentence, he didn't want to be involved in the trial of the co-defendant" (SM 22). Judge MacMahon, however, fixed September 19 as the date of sentence.

With respect to the ability of Miranda to understand at the time of his guilty plea, Moldow further testified (SM 23–24):

"This defendant was a person who was very familiar with courts and court processes and he was well-equipped to defend his interests. It was in his interests to be sentenced right away. He was the one who ini-

tiated that thought and certainly I did everything I could to bring it to pass because it definitely was preferable for him to just answer for his own troubles without getting involved in other people's problems."

Leisure, the Assistant United States Attorney in charge of the case, saw Miranda at the time of the guilty plea and at times earlier that year. He testified that he saw no indication at any time that Miranda was under the influence of drugs and "no indication of mental incompetence" (SM 31).

Demos, a probation officer, testified that he interviewed Miranda on August 22 for an hour and a half in the Court House after Miranda had pleaded guilty. This was for the purpose of preparing a presentence report. He saw no sign that he was in withdrawal (SM 315) or in any way incompetent; had he concluded Miranda was incompetent, he would have put this in his report (SM 321). Instead, based on his own observation, he reported: "The defendant is relevant, coherent, and direct, showing a remarkable memory for dates and events in his life" (Ex. 8, p. 6).

### The Sentence

After Miranda was returned to Rikers Island on the afternoon of August 22, he was sent back to the Infirmary.

The nurse's notes for Miranda resume on August 23 and are as follows:

| | |
|---|---|
| August 23 | "routine day" |
| August 24 | "quiet night" |
| August 24 | "fair day" |
| August 24 | "PM [two illegible words, the first of which may be "care"]" |
| August 25 | "quiet night" |
| August 25 | "fair day" |
| August 25 | "no complaint" |
| August 26 | "quiet night" |
| August 26 | "routine day" |
| August 27 | "quiet night" |
| August 27 | "seen by Dr. Reiff to be discharged" |
| August 27 (4–12) | "quiet evening" |
| August 28 | "quiet night" |

The records show that no medication was given Miranda during this period.

On August 28, 1968, Miranda was discharged from the Infirmary and transferred to the Bronx House of Detention. (The nurse's note above for August 28, "quiet night" was undoubtedly made early in the morning of that day and refers to the period after midnight August 27–28.)

The final note on discharge of Miranda was made by Dr. Reiff; his "symptoms" were drug addiction, physical findings were negative, "treatment" was said to be "sedation", and his "condition" was described as "improved".

The non-jury trial of co-defendant Rivera had been completed on August 26; Rivera was found guilty and his sentence set for September 19. The sentence of Miranda was referred to me also and his sentence was also set for September 19.

On September 19, Rivera was sentenced but Miranda was not produced. This was because the Marshals had not known of his transfer from Rikers Island and when they went there, of course could not obtain him.

Miranda was produced from state custody on September 26 and was sentenced on that day. There was no suggestion by him that his guilty plea had been made while drugged or incompetent. On the contrary, he participated actively and intelligently in the proceedings, especially in statements to the Court as to the state custody and charges. His explanation was that the state court would "go along" with the federal sentence and would surrender him to the federal authorities for service of his federal sentence. He also explained that he wanted to go back to Puerto Rico "as soon as this is over".

### Postsentence Proceedings

Miranda was released from state custody to serve his federal sentence on October 29, 1968.

Under date of November 19, 1968, from Lewisburg Penitentiary he moved for reduction of his sentence to 5 years.

This motion was denied by order filed on December 2, 1968. No suggestion was made in his letter that his guilty plea three months earlier had been made while he was drugged and incompetent.

The present motion was made by papers sworn to by Miranda at Atlanta Penitentiary on April 1, 1969. It represents undoubtedly the concoction of some other prisoner, eagerly accepted by Miranda as a possible means to escape his sentence, or at least to travel to New York at government expense. While at Lewisburg, according to Miranda (Ex. 3, p. 2), he met an inmate who told him "of the error that he had made" in pleading guilty.

A psychiatric evaluation was made in August 1969 by the Chief Medical Officer and Psychiatrist at Atlanta Penitentiary (Ex. 3). This concludes that there is nothing which would support a finding of mental incompetence on August 22, 1968, and that "he was most probably competent" at that time. This last expression is made because the psychiatrists at Atlanta had not examined Miranda on or about August 22, 1968.

### Conclusion

Movant was mentally competent at the time he pleaded guilty on August 22, 1968. He was then able to understand the proceedings against him and properly to assist in his own defense.

 The psychiatrist retained by movant at public expense (approved by me) did not seem to give any testimony differing from my conclusion because he said he could not now form a satisfactory professional opinion as to Miranda's competence on August 22, 1968 (SM 71). To the extent that any of the testimony of this psychiatrist may differ from my conclusion, such testimony cannot be accepted. There is not a scintilla of evidence that at the time he pleaded guilty Miranda was mentally incompetent or under the influence of drugs of any sort.

The proceedings on this motion constitute a melancholy example of a current serious defect in the federal administration of criminal justice. Clerks, reporters, defense counsel, psychiatrists, other doctors, prosecutors, judges and courtrooms can far better be employed in the trial of pending indictments where guilt is denied than in the determination of frivolous collateral attacks on a conviction after guilt has been established and is admitted.

The Court expresses appreciation for the persistent, devoted and able representation of movant by appointed counsel, Judson A. Parsons, Jr., Esq., and his colleague, Frank M. Headley, Jr., Esq.

The motion is denied. In respect of the in forma pauperis statute (28 U.S.C. § 1915(a)), it is certified that an appeal from this order is not taken in good faith. In this context good faith is judged by an objective standard and, if an appeal is frivolous, as a matter of law it is not taken in good faith. Coppedge v. United States, 369 U.S. 438, 445, 82 S.Ct. 917, 8 L.Ed. 2d 21 (1962); United States v. Visconti, 261 F.2d 215, 218 (2d Cir. 1958), cert. denied, 359 U.S. 954, 79 S.Ct. 743, 3 L. Ed.2d 762.

So ordered.